[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
The use of two docket numbers is necessitated by the assignment of a number to the PIR application when it was returned and a separate number being assigned when the complaint was returned. This has resulted in pleadings appearing in both files. The court is treating the two files as one.
The defendant is a mechanical contractor and held a contract to perform the mechanical work for the Jerome Harrison Elementary School in North Branford. One element of its contract was for the installation of an Energy Management System (EMS).
The defendant hired the plaintiff on or about April 21, 1997 to install the EMS for the project. The plaintiff was terminated in its role on May 5, 1997 by notice from the defendant.
The plaintiff seeks recovery of damages for its lost profit in one count and claims a CUTPA violation in its second count.
 DISCUSSION I
The defendant takes the position that the plaintiffs participation was terminated because of its refusal to provide an EMS which would meet the project specifications and satisfy the design engineer, Jeffrey Hammick.
Of significance on this issue is the fact that a system comprised of Barber-Colman components was called for in the CT Page 15284 specifications. In a conversation with Kevin Johnston, project manager employed by the defendant, the defendant's president, Kristopher Kelly, assured Johnston that he would meet the specifications and would provide Barber-Colman "end devices". Mr. Kelly did not inform Mr. Johnston that he was no longer a Barber-Coleman representative. Subsequently, Mr. Kelly proposed a system of Teletrol components, a company the defendant represented.
It should be noted that the purchase order under which the defendant awarded the work for the EMS to the plaintiff, was noted that it was "subject to approvals."
When Mr. Kelly sought approval from Mr. Hammick, he was told the Teletrol system would not be approved but Mr. Kelly persisted and stated Mr. Hammick could not reject the proposal.
The plaintiff stresses in its brief, the proposition that it was never given an opportunity to present a formal submission supporting the Teletrol system before the defendant's cancellation letter of May 5, 1997.
That theory is virtually destroyed by evidence outlining what happened after the purchase order was issued on April 21, 1997. Mr. Johnston first spoke to Mr. Kelly, advising him of the rejection of Teletrol by Mr. Hammick, but telling him it was up to him to either provide the Barber-Colman system required by the specifications or get the Teletrol system approved by Mr. Hammick.
On May 1, 1997, the defendant wrote to the plaintiff and advised it that the purchase order would be canceled by May 16th unless a Barber-Colman system was provided or an approval obtained for another system (Exhibit 9).
The plaintiffs response on May 2, 1997 (Exhibit 10) does not request time to prepare a formal submission of a Teletrol system. It is really an ultimation to the defendant and the project engineer to the effect that the plaintiff is free to provide its choice of system, the engineer must accept it, and if it is not accepted, legal action will follow.
It was as a result of this letter that the defendant issued its cancellation notice, effective at once as opposed to the May 16th date previously stated. Nothing in Exhibit 10 suggests the CT Page 15285 plaintiff was prepared to satisfy the requirements of the engineer or the specifications.
The plaintiff now claims in its brief, that he was preparing to meet the May 16th deadline. The court finds that position tenuous at best. Nothing in Exhibit 10 even suggests he was proceeding to submit anything. Actually, it reflects the antagonism Mr. Kelly had already directed at Mr. Hammick and Mr. Johnston.
While the plaintiff still persists in arguing that he could provide a Barber-Colman system, on May 22, 1997 in a phone conversation with Mr. Johnston, Mr. Kelly is quoted as saying it is possible he could provide a Barber-Colman system but he is not positive.
 II
The plaintiff argues in its brief that a "repudiation of a contract prior to performance allows the adverse party to treat the contract as breached . . ." citing Suppa Bros., Inc. v.Structures Inc., 12 Conn. App. 675, 677, (1987).
The court perceives the plaintiffs letter of May 2, Exhibit 10, as a repudiation of a contract wherein it tells the defendant and the agent for the project owner, it chooses not to provide what is requested by them but to provide what it wishes to provide.
And contrary to a statement made in its brief, the defendant's letter of May 1st was not the first time the plaintiff had been told a Barber-Colman system was to be provided. Even Mr. Kelly conceded that this was the subject in early discussions. Both Mr. Johnston and Mr. Hammick testified about numerous phone conversations with Mr. Kelly on the subject. These conversations were given additional credibility by the production of the notes made in the course of the conversations.
The court concludes that the plaintiff was given ample opportunity to obtain the engineers approval, that this plaintiff had already received final rejections and proceeded at its own risk in the fashion stated in Exhibit 10.
 CONCLUSION AS TO THE PLAINTIFF'S CONTRACT CLAIM CT Page 15286
The court finds that there was no contract between these parties because the plaintiff had not satisfied the project engineer's conditions. The purchase order which awarded the work to the plaintiff was specific in stating it was "subject to approvals."
Further, the action of the plaintiff in asserting it would not meet the job specifications justified the defendant's decision to terminate the process and revoke the purchase order.
There being no breach of contract and thus no damages incurred, judgment may enter for the defendant on the first count of the complaint.
 ALLEGED CUTPA VIOLATIONS IN THE PLAINTIFF'S FIRST COUNT AND IN THE DEFENDANT'S COUNTERCLAIM
Though withdrawing its breach of contract count in its counterclaim, the defendant has pursued its CUTPA claim. As noted above, the plaintiff also alleges a CUTPA violation.
Our Supreme Court has adopted the FTC rule for determining when a practice is unfair:
"(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) Whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]."
A-G Foods, Inc. v. Pepperidge Farms, Inc., 216 Conn. 200, 215
(1990); citations omitted. The Court also notes that:
"[t]he Federal Trade Commission has identified the "four primary categories of practices which have been prohibited as unfair: (1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high pressure sales techniques; and (4) depriving consumers of various post purchase remedies.' American Financial Services v. F.T.C., 767 F.2d 957,979 (D.C. Cir. 1985), cert. Denied, 475 U.S. 1011,106 S.Ct. 1185, 89 L.Ed.2d 301 (1986)." A-G Foods, Inc. v. Pepperidge Farm,Inc., supra, 216 n. 9. CT Page 15287
In view of the actions of the plaintiff as discussed in the above sections, this court is hard pressed to find anything done by the defendant which fits into any category listed above. It must be noted that the defendant had contractual obligations and was bound to operate within those requirements. It was the plaintiffs repudiation letter which produced the drastic action of the defendant and the plaintiffs unreasonable position which brought about the "showdown."
The plaintiffs CUTPA claim has no merit and must be dismissed.
In evaluating the defendant's CUTPA claim, it is noted at the onset that this issue deals with two commercial entities, vying with each other in a market place where both possess expertise.
While the plaintiff may have been less than candid with respect to its status as a Barber-Colman dealer, its attempts to effect a modification in the specifications and to persuade the project engineer to accept a substitute system were obvious from early in the discussions.
The plaintiff was probably overzealous and its position in asserting that the defendant and project engineer were obliged to accept his substitute system is untenable.
In the aggregate, however, the court does not see this behavior as the type contemplated by CUTPA, an offspring of the FTC.
 CONCLUSION
Judgment may enter for the defendant on the complaint and for the plaintiff on the counterclaim.
Antho V. DeMayo Judge Trial Referee